UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| CINCINNATI INSURANCE CO., | ) | CIV.  05-5094-KES |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER GRANTING |
| | ) | IN PART AND DENYING IN |
| SIERRA ROCK AND DIRT, INC., a | ) | PART MOTION TO DISMISS |
| Montana business corporation, and | ) | AND MOTION FOR |
| DIESEL MACHINERY, INC., a | ) | SUMMARY JUDGMENT |
| South Dakota business | ) | |
| corporation, | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff, Cincinnati Insurance Company, Inc. (Cincinnati), moves the court to dismiss and in the alternative to grant summary judgment on its claim for declaratory relief.  Cincinnati argues that it is entitled to a declaratory judgment that it had no duty to defend Sierra Rock & Dirt (Sierra), and further that Cincinnati is not required to indemnify Sierra for damages claimed by Diesel Machinery, Inc. (DMI).  Sierra and DMI oppose the motion. The motion is granted in part and denied in part.

## FACTUAL BACKGROUND

Sierra is a Montana corporation with its principal place of business in Great Falls, Montana.  As is relevant to this case, Sierra performed heavy dirt and demolition work in Lawrence County, South Dakota.  In connection with

its work in Lawrence County, Sierra rented a number of pieces of heavy machinery from DMI from September 20, 2003, until December 10, 2003.

Cincinnati is an Ohio insurance corporation, which conducts business in Montana and South Dakota. Cincinnati asserts that prior to September 20, 2003, it issued a "Commercial Inland Marine/Contractors Equipment Policy" (Policy) to Sierra, which was effective from June 3, 2003, through June 3, 2006. Policy, (Docket 1), Ex. A. In part this policy insured Sierra's interest in "Contractors' Equipment" subject to the conditions of the Policy. Policy, (Docket 1), Ex. A, Pt. 2 at 6. The Policy also contains the following language regarding Cincinnati's ability to adjust a claim directly with the owner of covered property:

> In the event of "loss" involving property of others in your care, custody or control, we have the right to:
>
> 1. Settle the "loss" with the owners of the property. A receipt for payment from the owners of that property will satisfy any claim of yours.
>
> 2. Provide a defense for legal proceedings brought against you. If provided, the expense of this defense will be at our cost and will not reduce the applicable Limit of Insurance under this insurance.

Policy, (Docket 1), Ex. A, Pt. 2 at 5.

On April 29, 2004, DMI filed a claim against Sierra in the Seventh Judicial Circuit Court of South Dakota (underlying litigation) for damages it alleged it suffered as a result of renting equipment to Sierra. Docket 1, Ex. B.

2

DMI sought $103,299.90 for damages suffered in the form of repair costs, late fees, and unpaid rental fees.  Id. at 2.  In its complaint, DMI asserted that it had supplied the following rental equipment to Sierra:

- Komatsu model PC400 (serial #A80085) excavator;

- Komatsu model PC250 (serial #A83025) excavator;

- Teledyene, model TB980X (serial #150-1422) breaker;

- Komatsu, model D41 (serial #B20717) dozer;

- Dynapac, model CA141 (serial #60411171) compactor/roller;

- IH, model MS853 (serial #B20122) water truck;

- Komatsu, model GD650A-2 (serial #203951) motor grader;

- Komatsu, model PC210 (serial #A83008) excavator and KVX 36", model 950 bucket attachment; and

- Felling, model FT-10 trailer

Id. at 2-3.

During the course of the underlying litigation, Sierra submitted sworn responses to discovery requests made by DMI.  Sierra characterizes the tenor of its responses as consistent with its effort to "aggressively defend" against the claims made by DMI.  Sierra Response (Docket 50) at 8.  Sierra tendered the claim to Cincinnati requesting that Cincinnati defend it in the litigation commenced by DMI.  Cincinnati subsequently refused to tender any defense on behalf of Sierra.  Sierra asserts that as a result of Cincinnati's failure to become involved in the underlying litigation, financial considerations forced

3

Sierra to reach a settlement agreement with DMI.  Sierra Response (Docket 50) at 10.

Cincinnati commenced this action seeking a declaratory judgment on the issue of its liability to Sierra under the Policy.  In its motion before the court, Cincinnati argues that it was not required to tender a defense to Sierra in the underlying litigation as a matter of law, and in the alternative that summary judgment on that issue is appropriate.  Cincinnati also asserts that there is no material factual dispute regarding its assertion that the damages claimed by Sierra are not covered by the Policy, and therefore that Cincinnati has no duty to indemnify Sierra.  Sierra opposes Cincinnati's motion, arguing that under Montana law Cincinnati had a duty to defend Sierra.  Sierra also argues that there is a question of fact regarding whether or not the damages claimed by DMI are covered by the Policy.

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56. Only disputes over facts that might affect the outcome of the case under the governing substantive law will properly preclude summary judgment.

4

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  Summary judgment is not appropriate if a dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Id.

The moving party bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  The nonmoving party is entitled to the benefit of all reasonable inferences to be drawn from the underlying facts in the record.  Vette Co. v. Aetna Cas. & Sur. Co., 612 F.2d 1076, 1077 (8th Cir. 1980).  The nonmoving party may not, however, merely rest upon allegations or denials in its pleadings, but must set forth specific facts by affidavits or otherwise showing that a genuine issue exists.  Forrest v. Kraft Foods, Inc., 285 F.3d 688, 691 (8th Cir. 2002).

## DISCUSSION

### I.    Choice of Law

In diversity cases, federal courts apply the choice of law rules of the forum state to determine which state's substantive law applies.  Retail Associates, Inc. v. Macy's East, Inc., 245 F.3d 694, 697 (8th Cir. 2001).  The court will therefore apply South Dakota's choice of law rules.

The South Dakota Supreme Court has stated that "[t]o determine which state's law to apply, we consider the nature of the action." Great West Cas. Co. v. Hovaldt, 603 N.W.2d 198, 201 (S.D. 1999). As was the situation in Great West Cas. Co., this case turns on policy coverage, and therefore sounds in contract. See id.

> South Dakota law provides that "[a] contract is to be interpreted according to the law and usage of the place where it is to be performed or, if it does not indicate a place of performance, according to the law and usage of the place where it is made" SDCL 53-1-4. . . . Generally, unless the parties agree otherwise, an insurance contract is "made" at the place where the last act necessary to its completion is accomplished.

Great West Cas. Co., 603 N.W.2d at 201 (citing Briggs v. United Servs. Life Ins. Co, 117 N.W.2d 804, 807 (S.D. 1962)).

The Policy lists as the insured's locations two Great Falls, Montana addresses and contains numerous Montana endorsements. Cincinnati asserts that it was "issued to a Montana corporation in Montana, through a Montana insurance agent." Policy, (Docket 1) Ex. A, Pt. 1 at 4, 6; Cincinnati Memorandum (Docket 31) at 4. The Policy also conforms its terms to Montana law. Policy, (Docket 1) Ex. 1, pt. 1 at 5-8. Cincinnati therefore asserts, and Sierra agrees, that this action should be adjudicated under Montana law. Because the last act necessary to complete the contract was performed in Montana, and the contract indicates that the parties intended Montana law to

6

govern, the court concurs with the parties in finding that Montana law governs this action.

## II.    Duty to Defend

Cincinnati seeks a declaratory judgment that it had no duty to defend Sierra in the underlying litigation.  Cincinnati argues that the terms of the Policy afford Cincinnati the right, but not the duty, to defend a claim involving an insured.

The issue of whether an insurance company has the duty to defend normally arises in a situation wherein the insured has a contractual right to a defense, provided that the conduct sought to be defended is within the scope of coverage provided by the policy.  For example, in Burns v. Underwriters Adjusting Co., 765 P.2d 712 (Mont. 1988), the Montana Supreme Court held that an insurance company had no duty to defend or indemnify when the record indicated that the injuries inflicted by the insured were not within the scope of the policy.  Id. at 712.  See also Farmers Union Mut. Ins. Co. v. Staples, 90 P.3d 381, 385 (Mont. 2004) ("Montana law is well-settled that an insurer's duty to defend its insured arises when an insured sets forth facts which represent a risk covered by the terms of an insurance policy.").  It is in this context that the often-stated black letter law "[t]he duty to defend is independent from and broader than the duty to indemnify created by the same

insurance contract," holds true.  See Skinner v. Allstate Ins. Co., 127 P.3d
359, 363 (Mont. 2005).

The question presented by this case, however, is markedly different.
Cincinnati argues that the nature of the Policy, which it characterizes as an
"Inland Marine Contract," is different than a typical liability policy which
generally includes a contractual duty to defend.  Under the terms of the Policy,
Cincinnati retains "the right to: . . . Provide a defense for legal proceedings
brought against [Sierra].  If provided, the expense of this defense will be at our
cost . . ."  Policy (Docket 1), Ex. A, Pt. 2 at 5.  The Policy explicitly states that
Cincinnati has the "right" to provide a defense, but the language does not
provide that Cincinnati has an obligation to do so.  Further, the phrase "If
provided" in the second sentence supports the conclusion that whether or not
a defense is provided is at the discretion of Cincinnati.

The parties have not cited, and the court is unaware of, any decisions by
the courts of Montana construing the language found in the Policy, and the
court therefore finds that it is an issue of first impression in Montana.

> Where neither the legislature nor the highest court in a state
> has addressed an issue, the federal court must determine what
> the highest state court would probably hold were it called upon
> to decide the issue.  In making this determination, a federal
> court may consider relevant state precedents, analogous
> decisions, considered dicta, scholarly works, and any other
> reliable data tending convincingly to show how the highest
> court in the state would decide the issue at hand.

8

Gilstrap v. Amtrak, 998 F.2d 559, 560 (8th Cir. 1993) (internal citations omitted).

In the insurance context, it is generally held that "[t]he duty [to defend] is contractual in nature." Guaranty Nat. Ins. Co. v. American Motorists Ins. Co., 758 F. Supp. 1394, 1397 (D. Mont. 1991); 14 Lee R. Russ & Thomas F. Segalla, Couch on Insurance 3d § 200:5 ("If there is no contract to defend, there is no duty to defend."); 7C Appleman, Insurance Law and Practice § 4682 (1979 & Supp. 1995). In construing language identical to that found in the Policy in the instant case, the Nebraska Supreme Court found no duty to defend, stating "since the contract terms govern the duty, an insurance policy may relieve the insurer of any duty to defend, or give the insurer the right, but not the duty to defend." Ohio Cas. Ins. Co. v. Carman Cartage Co., Inc., 636 N.W.2d 862, 867 (Neb. 2001) (quoting Russ & Segalla, Couch on Insurance 3d § 200:5).

Although this exact issue has not been reached by the Montana Supreme Court, this court is instructed by the deference the Montana Supreme Court gives to the written language of an insurance contract. Under Montana law, the court is "bound to interpret the terms of an insurance contract according to their usual, common-sense meaning as viewed from the perspective of a reasonable consumer of average intelligence not trained in law or insurance business." Lee v. USAA Cas. Ins. Co., 22 P.3d 631, 636 (Mont.

2001).  "If policy language is clear and explicit, this Court may not rewrite an insurance contract, but must enforce it as written."  Id.  See also Grimsrud v. Hagel, 119 P.3d 47, 53 (Mont. 2005) ([The Montana Supreme Court] has consistently held that where the language employed in an insurance contract is clear, the language controls, and the court must enforce it as written.").

The court finds that the language in the Policy unambiguously gives Cincinnati the right, but not the duty, to provide a defense to Sierra.  This construction is supported by the decisions of the three other courts which have construed the language at issue in this case.  See Centennial Ins. Co. v. Transitall Servs., Inc., 2001 WL 289879 at *3 (N.D. Ill. 2001) (unpublished); Ohio Cas. Ins. Co., 636 N.W.2d at 867; East Florida Hauling, Inc. v. Lexington Insurance Company, 913 So. 2d 673, 677-78 (Fla. App. 2005).  Considering this unambiguous construction and the deference given by Montana courts to the written language of an insurance policy, the court concludes that the Montana Supreme Court would find that under the language in the Policy, Cincinnati retained the right, but not the duty, to defend Sierra in any litigation.  Accordingly, Cincinnati's motion for summary judgment on its claim for a declaratory judgment that Cincinnati had no duty to defend Sierra in the underlying litigation is granted.[1]

---

[1]If the court is required to consider matters outside of the pleadings, dismissal under Rule 12(b)(6) is not appropriate.  Stahl v. U.S. Dept. of Agriculture, 327 F.3d 697, 701 (8th Cir. 2003).  Cincinnati argues that because

### III.   Duty to Indemnify

#### A.  Use of Prior Sworn Testimony

Cincinnati argues that Sierra is bound by its discovery answers provided to DMI during the course of the underlying litigation, as they are sworn admissions of a party under the Federal Rules of Evidence.  Cincinnati further argues that the doctrines of judicial and equitable estoppel prohibit Sierra from taking positions contrary to the answers in the discovery it provided during the underlying litigation.  Sierra responds that "[i]t is particularly disingenuous for Cincinnati to attempt to use discovery response answers to avoid coverage in this case, as it turns the issue of coverage completely on its head.  The issue is not whether the claims by DMI were aggressively defended or whether the claims were patently false. . . .  The focus should not be on the defense, but rather on the allegations of DMI in its Complaint and in its witnesses and other evidence in pursuing its claims."  Docket 50 at 8.

Statements of a party may be offered against that party as substantive evidence in accordance with Federal Rule of Evidence 801(d)(2).  In this case,

---

the  complaint is based upon the Policy, the Policy is a part of the pleadings and therefore can be considered in the context of a motion to dismiss.  The court has the discretion to consider documents it finds to be "undisputedly authentic" if the claims are based on the document in ruling on a motion to dismiss.  See Parnes v. Gateway 2000, Inc., 122 F.3d 539, 546 n.9 (8th Cir. 1997) (quoting In re Donald J. Trump Casino Sec. Lithog., 7 F.3d 357, 368 n.9 (3d Cir. 1993).  In this instance, however, the court finds an exercise of that discretion unnecessary, and that summary judgment under Rule 56 is a more appropriate vehicle for the resolution of this issue.

the president of Sierra provided signed and sworn statements regarding the cause of the alleged damage to DMI's equipment in the underlying litigation. These statements, to the extent they are adverse to Sierra's interest (i.e., they tend to prove that the damages alleged by DMI fell within the coverage exclusions in the Policy), are therefore admissions by an individual in his representative capacity pursuant to Rule 801(d)(2)(A).  Federal Rule of Civil Procedure 56(c) allows the court to rely on "admissions on file" in determining whether there is a genuine issue as to any material fact and consequently whether summary judgment is appropriate.  See, e.g., Buckley v. Air shield Corp., 116 F. Supp. 2d 658, 668-69 (D. Md. 2000).

Cincinnati also argues that the doctrines of judicial and equitable estoppel preclude Sierra from denying that any damages to the equipment it leased from DMI resulted from something other than ordinary wear and tear. The doctrine of judicial estoppel was explained by the Supreme Court as follows:

> Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.

New Hampshire v. Maine, 532 U.S. 742, 749, 121 S. Ct. 1808, 149 L. Ed. 2d 968 (2001).

12

In <u>New Hampshire v. Maine</u>, the Court set forth three factors that were relevant in determining whether a court should exercise its discretion in invoking the equitable doctrine of judicial estoppel: (1) if the party's later position is "clearly inconsistent" with its prior position, (2) whether the prior position was accepted by the court "so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled," and (3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not stopped." <u>Id.</u> at 750-51.

The court does not find it appropriate to invoke judicial estoppel in the instant case.  First, Sierra's current position is not "clearly inconsistent" with its prior position.  In the underlying litigation, Sierra asserted that it had not caused any damage to the equipment it rented from DMI beyond normal wear and tear.  But such an assertion does not preclude Sierra from arguing that if damage is in fact found to have occurred, it was the result of causes other than normal wear and tear.  Second, because the underlying litigation resulted in a settlement, any factual argument made by Sierra was not accepted by the court and there is therefore no chance that it would appear that any court was misled if Sierra is not stopped from asserting damage beyond normal wear and tear.  <u>See</u> <u>Water Tech. Corp. v. Calc. Ltd.</u>, 850 F.2d 660, 665-66 (Fed. Cir.

13

1988) ("[Because there has been no judicial acceptance of the asserted inconsistent position . . . there is no risk of inconsistent results, no effect on the integrity of the judicial process, and no perception that the court has been misled."). Finally, under the third factor, the court does not find that allowing Sierra to argue that any damage done to the equipment it leased from DMI was the result of something other than normal wear and tear would give it an unfair advantage or subject Cincinnati to an unfair detriment. Cincinnati was not a party to the underlying litigation, and therefore this is not a situation wherein Cincinnati is forced to defend against different arguments in different proceedings. Further, Cincinnati cannot assert that it was unaware of Sierra's position, as Sierra has consistently asserted to Cincinnati that "DMI's claimed damages to its equipment (albeit denied by Sierra), are covered causes of loss under Cincinnati's Contractors' Equipment Coverage Policy issued to Sierra." March 4, 2005 Letter (Docket 32-16) at 4.

The court similarly rejects Cincinnati's assertion that the doctrine of equitable estoppel should preclude Sierra from asserting that any damage caused to DMI's equipment was the result of something other than ordinary wear and tear.

> The party seeking [equitable] estoppel has the burden to prove that the party to be stopped knew the facts and intended that the conduct be acted on or acted so that the party asserting the estoppel had a right to believe that it was so intended, and that the party asserting the estoppel was ignorant of the facts, relied

14

on the other's conduct, and was injured because of that
reliance.

Design Prof'ls Ins. Co. v. Chicago Ins. Co., 454 F.3d 906, 912-13 (8th Cir.

2006).

Cincinnati has not met its burden to prove that Sierra intended

Cincinnati to act on Sierra's response to the discovery requests in the

underlying litigation.  In fact, the record reflects that although Sierra took a

defensive position in the underlying litigation, it asserted to Cincinnati that if

there was any damage to DMI's equipment, it was the result of a covered cause

of loss under the Policy. March 4, 2005 Letter (Docket 32-16) at 4.  The

March 4, 2005 letter, as well as Cincinnati's involvement in monitoring the

underlying proceedings, demonstrates that it was not "ignorant of the facts."

Given Sierra's consistent position, that Cincinnati was ultimately responsible

to indemnify it for any damages that occurred to DMI's equipment, the court

does not find that Sierra intended Cincinnati to rely on its responses to

discovery requests in the underlying litigation, nor that Cincinnati could have

reasonably relied on those responses to its detriment.  Therefore, the court

finds that Cincinnati has not met its burden to prove equitable estoppel is

appropriate in this case.

15

**B.  Coverage Under the Policy**

Cincinnati asserts that the interrogatories and requests for production submitted by Sierra in the underlying litigation demonstrate that there are no issues of material fact with regard to Cincinnati's liability under the Policy. Cincinnati points to the following exclusion language in the Policy:

3.   We will not pay for a "loss" caused by or resulting from any of the following.  But if "loss" by a Covered Cause of Loss results, we will pay for that resulting "loss."

. . .

    c.   Faulty, inadequate or defective:

        (1)  Planning, zoning, development, surveying, siting;

        (2)  Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

        (3)  Materials used in repair, construction, renovation or remodeling; or

        (4)  Maintenance;

    of part or all of any property wherever located.

    d.   Wear and tear, any quality in the property that causes it to damage or destroy itself, hidden or latent defect, gradual deterioration, depreciation; mechanical breakdown; insects, vermin, rodents; corrosion, rust, dampness, cold or heat.

Policy, Docket 1, Ex. A, Pt. 2 at 7.

In the complaint filed in the underlying litigation, DMI alleged that it was owed $103,299.90 in damages, plus interest, for "rental fees, late charges

16

and repair costs." DMI Complaint, (Docket 1), Ex. B at 2.  Pursuant to the

Sworn Statement of Proof of Loss filed by Sierra with Cincinnati, $69,679.10 of

the damages alleged by DMI were for damage to rented equipment, and

therefore potentially within the scope of the Policy Coverage.  Proof of Loss,

(Docket 1), Ex. 6 at 2.  In a letter from Sierra to Cincinnati, dated March 4,

2005, counsel for Sierra noted losses regarding several pieces of equipment:

$4,790.81 for damage to the Komatsu PC210, $2,363.00 in damage for the

Komatsu OD650, $14,464.09 for the Komatsu PC250, and $28,274.98 for the

Teledyene TD980X.  Docket 32-16, Ex. B6 at 2-5.  These figures are also

reflected in a letter sent to Sierra by Glenn Boomsma, counsel for DMI, in a

"last ditch effort" to avoid trial in the underlying litigation.  Docket 32-22, Ex.

B6 at 7-11 (Boomsma Letter).  In the Boomsma letter, the total amount sought

by DMI for repairs to equipment leased by Sierra was $61,520 for damages to

the Komatsu PC250, the Teledyene TB980X, the Komatsu PC210, and the

Komatsu OD650.[2]  Id.  For purposes of this summary judgment motion, the

court will review any relevant evidence in the record with regard to each piece

---

[2]Both the March 4, 2005 letter and the Boomsma letter refer to a
Komatsu OD650.  DMI's complaint and the relevant discovery responses refer
to a Komatsu GD650A-2.  After reviewing the record, the court concludes that
these references are to the same piece of equipment, which the court will
hereinafter refer to as the Komatsu GD650A-2.

of identified equipment to determine whether a material issue of fact exists on

Cincinnati's liability under the policy.[3]

### 1.   Komatsu Model PC250 (serial #A83025) Excavator

DMI claimed four incidents of repair to the Komatsu PC250.  Boomsma

Letter, (Docket 32-16), Ex. B6 at 2-5.  The largest repair is alleged to have

occurred on January 15, 2004, for $14,464.09.  Three other repairs totaling

$2,217.87 were also alleged to have occurred in August and September of

2003.  In its response to interrogatories, Sierra stated that at the time it took

possession of the Komatsu PC250 from DMI the:

> Equipment was an older well-used machine with 6700 hours on
> it and was severely scratched and gouged on the counter
> weight.  This can be seen in the pictures in Exhibit D.  It was
> missing the ashtray, and the stereo did not work.  The rollers
> and links were in poor condition and needed to be replaced as
> was pointed out to DMI field representative, Maurice. We had
> trouble with hydraulic lines and fuel return lines from day one.
> They kept blowing out because of the design, and the fuel line
> was rotten.

Docket 32-17, at 15.

Sierra stated that in returning the Komatsu PC250, the "[e]quipment

was returned in the same condition except for minor damage to rear access

door and lower left compartment rail."  Id.  Sierra also cites, in its response to

---

[3]After reviewing the record and submissions by the parties, it is not clear
to the court how the parties arrived at the figure of $69,679.10.  The figure in
the Boomsma letter identifies a total of $61,520 in damages, and the record
does not further delineate how the difference of $8,159.10 in damages is
apportioned between the pieces of equipment rented by Sierra.

the motion for summary judgment, deposition testimony from the project manager at the Lawrence County site that the mechanic had informed him that the mechanical inner workings of the breaker on the Komatsu PC250 had "exploded inside." Docket 50, at 5. By contrast, in DMI's invoice dated January 23, 2004, DMI claims that it received the PC250 with significant damage, including a "right rear door [that was] torn from hinges," a cylinder rod "found to have deep damage," a cracked rear cab window, and other damage. Docket 51, Ex. D at 2. Cincinnati argues that Sierra's statements clearly bring the damages suffered into the exclusions of the Policy, specifically that they show that the damages resulted from "mechanical breakdown."

After reviewing the relevant invoices, the court concludes that there is a material factual dispute regarding the cause of the damages to the Komatsu PC250 by DMI. The deposition testimony does not indisputably establish that the breaker damage was the result of a "mechanical breakdown." The project manager stated that the mechanic informed him that the breaker "exploded inside," which could have been the result of any variety of causes, some of which could be covered by the Policy. Further, damage to the breaker was not the only damage claimed by DMI with regard to the Komatsu PC250. Viewing the evidence in the light most favorable to Sierra and giving Sierra the benefit of all reasonable inferences, the court finds that Cincinnati has not met its burden of bringing forth sufficient evidence to show that there is no question

19

of material fact regarding whether or not the cause of the damage to the Komatsu PC250 falls within one of the exclusions in the Policy.  Summary judgment on that portion of the claim is therefore denied.

### 2.    Teledyene, Model TB980X (serial #150-1422) Breaker

DMI claimed three instances of repair and one estimate for repair for the Teledyene TB980X.  Boomsma Letter, (Docket 32-16), Ex. B6 at 2-5.  DMI estimated that a repair on January 15, 2004, would result in $28,274.98 in costs.  Id.  DMI also claimed three repairs in November and December of 2003, totaling $7,758.80.  Id.  In response to interrogatories, Sierra stated that at the time it took possession of the Teledyene TB980X from DMI, there was "no way to inspect the condition of the internal components breaker because of its design."  Docket 32-17, p. 15.  Sierra further stated that the "[e]quipment was returned in working condition."  Id.

In its response to the motion for summary judgment, Sierra points to the invoice regarding repairs on the Teledyene TC980X, which states that DMI "found bit stem broken off and wedged into upper bushing.  End of piston was mushroomed and dented and would not come out of bore. . . . Top shoulder on lower housing was cracked from broken bit at stem."  Docket 51, Ex. F at 2.  Sierra asserts that the nature of these damages, and the high expense of their repair, indicate that they are not the result of "ordinary wear and tear."  Response, Docket 50 at 6.

Sierra's assertion in its interrogatory that the "equipment was returned in working condition" is not sufficient to indicate that any damage to the equipment was caused by conduct excluded by the Policy.  DMI asserted that there was significant damage to the TC980X, and there is no evidence indicating how that damage was caused.  DMI was in possession of the equipment and in the best position to determine any damage.  The statements made by Sierra do not preclude it from arguing that whatever damages may have occurred, even though it was unaware of the damages when the equipment was returned to DMI, were the result of causes covered by the Policy.  There is, therefore, an issue of fact to be determined regarding whether the damage alleged by DMI was caused by conduct within the scope of the Policy, and summary judgment is not appropriate.

### 3.    Komatsu, Model PC210 (serial #A83008) Excavator and KVX 36", Model 950 Bucket Attachment

DMI claimed three instances of repair to the Komatsu PC210, in September and December of 2003 and January of 2004.  Boomsma Letter (Docket 32-16), Ex. B6 at 2-5.  The total of these three repairs was $6,541.99.  In response to interrogatories, Sierra stated that at the time it took possession of the Komatsu PC210 from DMI, the "[e]quipment was a well-used machine in fair condition.  The teeth on the bucket were worn out and had to be replaced."  Docket 32-17, at 15.  Sierra further stated that in returning the equipment the "cab had been damaged during use."  Id.

21

On December 2, 2004, Sierra made a claim (prior claim) under the Policy for damage to the Komatsu PC210.  SUMF 11.  Cincinnati adjusted the claim directly with DMI, after applying a $1,000 deductible and separating out the portion Cincinnati attributed to "normal wear and tear."  SUMF 14. Cincinnati made a joint payment to Sierra and DMI in the amount of $3,875.10.  Docket 32, Ex. B2; Cincinnati's Reply (Docket 55) at 14. According to its interrogatory response, Sierra stated that the "damage was submitted to Sierra Rock & Dirt Inc., insurance company who paid the damage claim."  Docket 32-18, p. 1.  Cincinnati did not secure a release from DMI when paying for the damage.

While Cincinnati is entitled to credit for the amount it paid out in the prior claim, that amount does not fulfill the entirety of DMI's claim for the Komatsu PC210.[4]  The court therefore finds that there is a material issue regarding whether Cincinnati fully fulfilled its duty to indemnify under the Policy, and summary judgment is denied.

---

[4] Cincinnati adjusted its payment on the prior claim to exclude $915.71, which it allotted as the cost to repaint "any portion of the excavator other than the area of the damaged cab," as Cincinnati found that to fall under the Policy exclusion for "normal wear and tear."  Cincinnati's Reply (Docket 55) at 14. The court notes that the underlying claim was the result of the Komatsu PC210 falling on its side, which may have been the cause of the damage to the paint, and therefore there is a material issue of fact as to whether that damage was the result of "normal wear and tear."

### 4.   Komatsu, Model GD650A-2 (serial #203951) Motor Grader

DMI claimed one instance of repair to the GD650-A2 Grader in December of 2003, totaling $2,363 in damages.  Boomsma Letter (Docket 32-16), Ex. B6 at 2-5.  In response to interrogatories, Sierra stated that at the time it took possession of the Komatsu GD650A-2 the "equipment was in decent condition except for the bar that held the scarifier in place.  The bar had been previously damaged and had been forced onto the pin of the scarifier.  It was being held in place by a snap ring.  The scarifier was never used."  Docket 32-17, at 15.  Sierra further stated that in returning the equipment the "equipment was returned in good shape except the scarifier came off because of snap ring failure and/or damage was caused prior to rental by Sierra Rock & Dirt, Inc., and would not have been known had the snap ring not failed."  Docket 32-18, at 1.

Although Sierra asserted in its discovery responses that it believed it returned the equipment in "good shape," DMI asserted in the underlying litigation that damages occurred.  In the context of this summary judgment motion, the court will assume that DMI's claims have merit.  The damages claimed by DMI could be the result of normal wear and tear, or they could be the result of some action not excluded by the Policy and for which Cincinnati is therefore liable.  Cincinnati has not met its burden of showing that there is

23

no issue of fact regarding the cause of the damages, and accordingly, summary judgment is denied.

### 5.   Remaining $8,159.10

As noted above, the parties agree that DMI claimed $8,159.10 in damages to equipment beyond the four pieces explicitly discussed above.  In its motion for declaratory judgment, Cincinnati does not indicate which pieces of equipment these damages claims originate from, much less demonstrate how Sierra's discovery responses prove that the damages suffered fall within one of the exclusions of the Policy.  Cincinnati has therefore not met its burden in demonstrating that there is no material factual dispute, and summary judgment is not granted for that portion of Sierra's claim

Accordingly, it is hereby

ORDERED that Cincinnati's motion for summary judgment (Docket 30) on its claim for declaratory judgment is granted in part and denied in part as set forth in this order.

IT IS FURTHER ORDERED that Sierra's request for oral argument (Docket 53) is denied.

Dated March 2, 2007.

BY THE COURT:


/s/ *Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE

24